## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| HEATHER D. GALVAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV00911 AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Heather Galvan was not disabled

and, thus, not entitled to disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401-434, or Supplemental Security Income under Title XVI of the Act,

*id.* §§1381-1383f.  For the reasons set forth below, the decision of the Commissioner

shall be affirmed.

Plaintiff, who was born on December 21, 1977, filed her applications for benefits

on April 4, 2007, at the age of 31, alleging a disability onset date of August 18, 2006, due

to kidney problems, obsessive compulsive disorder ("OCD"), and anxiety.  After

Plaintiff's applications were denied at the initial administrative level, Plaintiff requested a

hearing before an Administrative Law Judge ("ALJ").  Such a hearing was held on

February 20, 2009.  By decision dated April 15, 2009, the ALJ found that Plaintiff had

the residual functional capacity ("RFC") to perform certain jobs that were available in the

national economy, and was therefore not disabled under the Act.  Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on March 26, 2010.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole.  Specifically, Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's subjective complaints.  Plaintiff asks that the ALJ's decision be reversed and remanded for the award of benefits or for further consideration.

## BACKGROUND

### Work History and Application Forms

The record indicates that Plaintiff worked as a factory line worker, cashier at multiple fast-food restaurants and gas stations, inventory counter, department store associate, medical assistant at a doctor's office, rural carrier at a post office, and sales representative at a calling center.  Plaintiff was discharged from her last job, as a factory line worker, on January 23, 2007, for allegedly missing four days of work without calling in.  (Tr. 180-88, 142-43.)

### Medical Record

On August 15, 2006 (three days before her alleged disability onset date), Plaintiff told her primary physician, Felipe Eljaiek, M.D., that she was nauseous and vomiting, suffering "emotional distress," and experiencing tingling and numbness on her left side. Dr. Eljaiek ordered a CT scan of Plaintiff's head; the scan was conducted on August 18,

2

2006, with results that were negative in all relevant respects. (Tr. 279, 267.) At follow-up a week later, Dr. Eljaiek diagnosed Plaintiff with hypertension, depression, and obesity, and recommended that she quit smoking. (Tr. 278.) On September 1, 2006, Dr. Eljaiek prescribed Cymbalta for Plaintiff's depression. (Tr. 277.)

On March 20, 2007, following blood work that showed abnormal creatinine levels, Dr. Eljaiek referred Plaintiff to Dr. Tingting Li, M.D., a nephrologist. (Tr. 274.) Plaintiff began treatment with Dr. Li on March 23, 2007, at which time Plaintiff reported OCD as part of her medical history. Dr. Li assessed chronic kidney disease as a result of longstanding hypertension. He ordered diagnostic tests and encouraged smoking cessation, weight loss, and exercise. A renal sonogram on March 27, 2007, indicated normal sized kidneys lacking obstructions and a normal bladder, and no evidence of renal artery stenosis. (Tr. 296-305.) On May 18, 2007, Dr. Li diagnosed Plaintiff with stage three chronic renal disease. (Tr. 301.)

Plaintiff returned to Dr. Eljaiek's office on July 18, 2007, reporting that Prozac was not helping her anxiety and OCD. Dr. Eljaiek noted that Plaintiff had severe social anxiety, was washing her hands frequently, and had had a traumatic childhood. He assessed OCD, mood disorder, and anxiety and prescribed Zoloft, Xanax, and Inderal. Upon Plaintiff's request, she was referred to a psychiatrist. (Tr. 376.)

At a follow-up visit with Dr. Li on September 7, 2007, Dr. Li observed improvement in renal function and reported that Plaintiff's blood pressure was well controlled. (Tr. 402.)

Plaintiff began seeing Narsimmha Muddasani, M.D., a psychiatrist, on September 28, 2007, complaining of OCD, anxiety, panic attacks, and night terrors/dreams.  Dr. Muddasani's Initial Psychiatric Evaluation stated that Plaintiff was depressed, irritable, and tearful, and that she reported that she could not do public speaking and would "freeze up" with over five to ten people.  He diagnosed bipolar disorder, anxiety disorder, and a GAF of 60,[1] and prescribed Abilify.  (Tr. 367-68.)  Plaintiff saw Dr. Muddasani again about once every two months through January 2009.  His notes are largely illegible, but they do show his evaluation of Plaintiff's intellectual functioning as average and of her thought process as coherent and logical.  Later treatment notes evaluate Plaintiff's mood as euthymic. (Tr. 361-66.)

Meanwhile, on December 21, 2007, Dr. Li wrote that Plaintiff's problems related to acute renal failure continued to improve.  (Tr. 401.)  On January 10, 2008, Dr. Eljaiek diagnosed hypertension, renal insufficiency chronic unstable, and depression.  (Tr. 373.)  On April 17, 2008, Plaintiff told Dr. Eljaiek that Dr. Muddasani told her that her depression and especially her bipolar disorder were getting worse.  Her blood pressure

---

[1]   A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

was 152/82 and she was smoking one pack of cigarettes a day.  (Tr. 372.)

On August 15, 2008, Plaintiff saw Dr. Li for routine follow-up.  Her blood pressure was 144/88 and her renal functioning had improved, and she was scheduled to follow-up in three months.  (Tr. 417.)

Plaintiff saw Dr. Eljaiek on November 4, 2008, complaining of lower extremity edema.  He noted that she had been started on Depakote and Seroquel by Dr. Muddasani for her mental disorder.  Her blood pressure was recorded as 126/84.  Dr. Eljaiek recommended that Plaintiff cut back on Depakote and Seroquel, and continue taking her medication for high blood pressure, and Xanax as needed.  (Tr. 370.)

At follow-up on November 7, 2008 with Dr. Li, it was noted that Plaintiff looked anxious, weighed 204 pounds, and had poorly-controlled blood pressure and edema in her legs of unclear etiology, which was contributing to her elevated blood pressure.  (Tr. 412-14).  An ultrasound of Plaintiff's legs to investigate the cause of the edema was normal. (Tr. 403).  On January 9, 2009, Dr. Li noted that Plaintiff's edema had resolved, that her hypertension seemed very well controlled, but that her renal function had worsened since her last visit and would continue to be watched.  (Tr. 409-10.)

Also on January 9, 2009, Dr. Muddasani seemed to indicate the Plaintiff's depression had improved.[2]  He indicated that Plaintiff's mood was normal (euthymic), and again, that her thought process was coherent, logical, and goal oriented.  (Tr. 405.)

---

[2]    The notes appear to reference depression with a down arrow.

On March 6, 2009, Dr. Li noted that Plaintiff's blood pressure was "reasonable" at 135/72.  Current medications were listed as Benazepril, Triamterene, Atenolol, Diltiazem, Clonidine, Depakote, Albuterol inhaler, Seroquel, Levothyroxine, Lovastatin, Tramadol, Omeprazole, Requip, and Soma.  Plaintiff told Dr. Li that "she had been doing quite well until a couple days ago" when she started having burning with urination, and that she continued to have some urinary urgency, frequency, and  incontinence.  Dr. Li reported that Plaintiff's acute renal failure had "essentially resolved."  He again encouraged weight loss and exercise.  (Tr. 406-08).

The record includes urology progress notes dated March 20, 2009, which suggested that nocturnal incontinence that Plaintiff was experiencing might be due to medication.  (Tr. 419.)

**Evidentiary Hearing of February 20, 2009 (Tr. 22-82)**

Plaintiff testified that she was 31 years old and lived in a house with her two-year old son, mother, younger sister, and step-father.  Plaintiff had a GED, had taken some college classes, and had completed a certificate in medical assisting.  She reported experiencing anxiety whenever she had to speak in front of a class.  Plaintiff tried to take online classes, but did not complete them.  She testified that she was 5' tall, and weighed approximately 205 pounds.  She knew simple arithmetic, could write, and had shopped online.

Plaintiff testified that she was currently on Medicaid and had last worked in January 2007 on an assembly line at a factory.  She was fired for not showing up when

her son was having surgery.  Plaintiff then recounted the rest of her work history.
She testified that she was able to scrapbook, change diapers**,** bathe and dress her son,
vacuum, dust, cook, do laundry, and drive.  She drove her son to the park often, but the
crowds there made her anxious because she felt people were staring at her and judging
her.  Plaintiff testified that the last time she had an anxiety attack was at Christmas, when
she traveled to different houses to visit relatives.  She described an anxiety attack as
feeling her heart racing, like she was "having a heart attack," and stated that the attacks
were often caused by crowds.

 Plaintiff testified that she was also diagnosed with bipolar disorder, high blood
pressure, and kidney failure**.**  She took five medications for high blood pressure, and
experienced frequent urination problems related to her kidney problems.  She had to use
the restroom every three hours, and often had accidents where she wet her bed.  Plaintiff
also had restless leg syndrome, but had taken herself off the medication for that because
she had trouble waking up when she was on it.  She did not tell her doctor that she
stopped taking the medication.  Plaintiff also complained of an irregular heart beat, acid
reflux, and depression.  She took Omeprazole for acid reflux, and Seroquel and Depakote
for depression.

 Plaintiff testified to back and neck pain, and asthma.  She took Albuterol three
times a day for her asthma.  She smoked five cigarettes a day, did not drink alcohol, and
did not use marijuana.  The last time she drove more than 100 miles from home was when

her uncle died in March 2008.  Plaintiff explained that she was unable to complete her online classes because she could not keep up with the discussion boards.  She did not go shopping anymore because she felt overwhelmed and felt that people were watching and judging her.  She described an occasion when she left a full cart of food at the store before paying for it because she got overwhelmed.

Plaintiff testified that she had OCD and constantly washed her hands, sometimes to the point where they cracked and bled.  She slept with socks and Vaseline on her hands so that she could bend her fingers without them cracking.  She washed her hands over 30 times per day after touching her face, sweeping, or touching something dirty.  Plaintiff also checked the locks on her doors and windows over and over to make sure they were fully closed.

Plaintiff explained that her depression caused her to not want to get dressed or go outside, unless necessary.  She did not have many friends and had a lot of problems with her father.  Plaintiff's father had a drug addiction and Plaintiff recounted an instance where he held a gun to her mother's head, and caused Plaintiff and Plaintiff's sister to run to their grandparents' house, where he followed with a shotgun.  Plaintiff stated that the police were often called to Plaintiff's house because of her father.  She had crying spells a couple of times a week and had trouble getting along with her family, but she had not thought about suicide since she was in seventh grade.

Plaintiff testified that her medication caused her to be groggy in the mornings and made her eyes burn.  She could walk less than a full block before her back went numb,

8

and she had to rest; and stand for about 15 minutes or make it about halfway up a flight of stairs before her legs went numb.

Plaintiff testified that she did not participate in any social activities and preferred to stay in her room at her house.  Due to her bladder problems, she had wet the bed five times since the end of December.  She thought this was from too much medication, and was going to see a bladder specialist.

The ALJ asked the VE to consider an individual of Plaintiff's education, training, and work experience, who could not lift anything, but could carry 20 pounds occasionally and 10 pounds frequently; could stand and walk six hours during an eight-hour work day; should avoid concentrated exposure to cold, wet, heat, humidity, fumes, odors, dust and gas; was able to respond to supervisors and coworkers in a setting where contact with others was casual and infrequent; could perform complex tasks and work at a normal pace without production quotas; and should not work in a setting where there was regular contact with the general public.

The VE testified that such an individual could perform the work of an electrode cleaner, a bench assembler, and an addresser, and that these jobs existed in significant numbers in both the local and national economies.

The ALJ then asked the VE to consider the same individual with the additional limitations that the person could understand, remember, and carry out only simple instructions and non-detailed tasks; maintain concentration and attention for only two-hour segments over an eight-hour period; adapt to routine of only simple work changes;

9

and should not work in a setting which included constant regular contact with the general public.

The VE testified that such an individual could not do the work of the electrode cleaner or bench assembler, but could do the work of an addresser, an egg processor, or a stringing machine tender.  The VE stated that these jobs exist in significant number in the local and national economies.

The ALJ then asked the VE to consider an individual with the same limitations as the above hypothetical, but because of the individual's anxiety and panic attacks, would have up to three absences per month, and may encounter monthly negativity with the supervisor.  The VE testified that there were no jobs that such an individual could perform.

Plaintiff's attorney then asked the VE to consider an individual who was capable of sedentary work, and could sit, stand**,** and walk through an eight-hour work day, but would have anxiety and panic attacks; would require unscheduled bathroom breaks at least twice a day; and would be compelled to engage in obsessive behavior, such as needing to wash their hands at frequent and unpredictable intervals.  The VE testified such an individual would not be able to perform any of the jobs previously identified.

**ALJ's Decision of April 15, 2009** (Tr. 10-19)

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of August 18, 2006, and had the severe impairments of renal failure secondary to hypertension, restless leg syndrome, obesity, and anxiety.  He

found that none of these impairments, individually or in combination, equaled a deemed-disabling impairment listed in the Commissioner's regulations.

Plaintiff's mental impairments were determined to be nonsevere because they did not cause marked limitations in at least two of the four relevant functional areas (daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation), or one area with marked limitation and repeated episodes of decompensation.

The ALJ then determined that Plaintiff had the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk six hours in an eight-hour day; and sit for six hours in an eight-hour day.  She needed to avoid concentrated exposure to extremes of cold, heat, wetness, and humidity; and concentrated exposure to fumes, odors, dust, and gasses.  She was able to respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others was casual and infrequent; perform some complex tasks; and work at a normal pace without production quotas; but could not work in a setting which included constant or regular contact with the general public.

In support of this RFC assessment, the ALJ pointed to the fact that Plaintiff stopped working on her alleged disability onset date not because of any significant mental or physical impairments, but because she was fired after taking time off to be with her son who had surgery.  The ALJ also noted that Plaintiff continued to smoke against medical advice, which the ALJ believed  "undermine[d] the professed seriousness of her

hypertension." Furthermore, the record did not provide "persuasive evidence" that her hypertension resulted in heart-related complications such as left ventricular failure. The only resulting complication was renal failure of one kidney for a short period of time, with no documentation that this caused any "significant work place limitations."

With respect to Plaintiff's allegations of anxiety and OCD, the ALJ stated that the records did not indicate that Plaintiff received "regular treatment from a mental health professional, such as a psychologist or psychiatrist, or that she required any inpatient treatment for her mental impairments." The ALJ then noted and discussed the mental health treatment Plaintiff received from her primary care physician. The ALJ also noted that Plaintiff "briefly" saw a psychiatrist, Dr. Muddasani, and discussed that treatment, as well. The ALJ pointed to Dr. Muddasani's September 28, 2007 GAF assessment of 60[3] and his repeated indications in his treatment notes that Plaintiff's thought process was coherent and logical. The ALJ also noted that the most recent treatment notes, of January 9, 2009, reflected no adverse symptoms or limitations, and included notations that Plaintiff's thought process was "coherent, logical and goal directed." The ALJ (mistakenly) characterized Dr. Eljaiek's treatment notes from November 4, 2008, as stating that Plaintiff had no depression or anxiety.

The ALJ concluded, based upon the testimony of the VE, that Plaintiff could perform the work of electrode cleaner, bench assembler, and addresser, and that these

---

[3]   The ALJ mistakenly dated this assessment as November 9, 2007.

12

jobs existed in significant numbers in the state and national economies.  Thus, the ALJ

found that Plaintiff was not disabled under the Social Security Act.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must review

the entire administrative record to 'determine whether the ALJ's findings are supported

by substantial evidence on the record as a whole." *Johnson v. Astrue*,  628 F.3d 991, 992

(8th Cir.  2011).  The court "'may not reverse . . . merely because substantial evidence

would support a contrary outcome.  Substantial evidence is that which a reasonable mind

might accept as adequate to support a conclusion." *Id.* (citations omitted); *see also*

*Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of

substantial evidence allows for the possibility of drawing two inconsistent conclusions,

and therefore, embodies a "zone of choice," within which the Commissioner may decide

to grant or deny benefits without being subject to reversal by the reviewing court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in

substantial gainful activity which exists in the national economy, by reason of a medically

determinable impairment which has lasted or can be expected to last for not less than 12

months.  42 U.S.C. § 423(d)(1)(A).  The Commissioner has promulgated regulations,

found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to

determine disability.  The Commissioner begins by deciding whether the claimant is

engaged in substantial gainful activity.  If so, benefits are denied.  If not, the

Commissioner decides whether the claimant has a severe impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).  A special technique is used to determine the severity of mental disorders.  This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  § 404.1520a(c)(3).

If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations.  If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work.  If so, the claimant is not disabled.  If the claimant cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's RFC and vocational factors -- age, education, and work experience. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

## ALJ's Evaluation of Plaintiff's Credibility

Plaintiff argues that in evaluating the credibility of Plaintiff's allegations of disability, the ALJ failed to discuss the side effects of Plaintiff's medications on her ability to work.  She further argues that the ALJ misconstrued the medical record by

stating that it showed that Plaintiff did not receive regular treatment from a mental health professional and that Dr. Eljaiek reported on November 7, 2008, that Plaintiff had no depression or anxiety.  In addition, Plaintiff complains that the ALJ misapplied the "failure to follow prescribed treatment" rule with respect to Plaintiff's smoking, as there is no evidence that her condition might have improved had she stopped smoking.

In *Polaski v. Heckler*, 739 F.2d 1320, 1332 (8th Cir. 1984), the Eighth Circuit explained that one of the relevant factors an ALJ should consider in evaluating the credibility as to her ability to work is the side effects of medication.  "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001).  Upon review of the record, the Court concludes that the ALJ adequately considered the evidence before deciding that Plaintiff's allegations of disabling conditions were not fully credible, and that this decision was supported by substantial evidence.

"Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (citing *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001) (noting that ALJ's finding that plaintiff was not fully credible was supported by the fact that plaintiff did not lose his job because of his disability, but because his position was eliminated)).  Here the record establishes that Plaintiff stopped working on her alleged disability onset date because she was fired for reasons apparently not related to her own physical or mental

15

conditions.  The ALJ properly relied on this fact in discrediting Plaintiff's allegations.
*See Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009).

Plaintiff is correct that the ALJ erred in stating that Dr. Eljaiek reported on
November 4, 2008, that Plaintiff had no depression or anxiety.  In fact, he noted "mood
disorder" and anxiety.  But Plaintiff's suggestion that the ALJ failed properly to
recognize the treatment from Dr. Muddasani is not supported by the record.  The records
reflect eight visits from September 2007 through January 2009.  While one might quibble
with the ALJ's characterization of Plaintiff's treatment relationship with Dr. Muddasani
as "brief," the ALJ properly noted and discussed the dates and duration of the treatment.
The ALJ specifically pointed to Dr. Muddasani's September 28, 2007 GAF assessment of
60, to Dr. Muddasani's repeated indications that Plaintiff's thought process was coherent
and logical, and to the fact that later treatment notes did not reflect serious concerns with
depression.  Indeed, the bulk of Dr. Muddasani's treatment notes after the initial visit
evaluate Plaintiff's mood as "euthymic," and neither depression nor anxiety are marked.
*See Halverson*, 600 F.3d at 931 (holding that the ALJ was entitled to rely on the
claimant's history of GAF scores between 52 and 60, in finding that the plaintiff was not
disabled, despite one GAF of 40 and a treating psychiatrist's assessment of more severe
limitations, where mental status examinations were largely unremarkable).  In addition
the ALJ's decision took into account Plaintiff's inability to work at a job requiring more
than casual and infrequent contact with others.

As the ALJ held, no physician ever imposed any functional limitations on Plaintiff,

16

a proper factor for the ALJ to take into consideration.  *See Dunahoo,* 241 F.3d at 1038-39 (finding ALJ's credibility determination was supported by substantial evidence where he recited appropriate factors and noted inconsistencies in record, such as lack of physician-ordered functional restrictions).

Where substantial evidence supports the ALJ's determination, the court must affirm, even if the evidence might support a different conclusion.  *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005).  Here the Court finds substantial evidence supports the ALJ's determination.

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 28th day of September, 2011